# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OKLAHOMA

### CASE NO.:

(1) MARTIN CHERRY, an individual,

    Plaintiff,

v.

(1) TURTLE CREEK ASSETS, LTD., a Texas limited partnership, by and through its general partner,
(2) ROYAL PARK HOLDINGS, INC., a Texas corporation, doing business as "Forward Properties, Inc."

    Defendants.

_____/

## COMPLAINT FOR DAMAGES AND INCIDENTAL RELIEF

Plaintiff, Martin Cherry, an individual, sues Defendants, Turtle Creek Assets Ltd., a Texas limited partnership, by and through its general partner, Royal Park Holdings, Inc., a Texas corporation, doing business as "Forward Properties, Inc.," and alleges:

### *INTRODUCTION*

1. This is an action for violation of 15 U.S.C. §1692, *et seq.*, known more commonly as the "Federal Fair Debt Collection Practices Act" ("FDCPA"), and 15 Okla. Stat. §751, *et seq.* known more commonly as the "Oklahoma Consumer Protection" ("OCPA"), which prohibits debt collectors from engaging in abusive, deceptive and unfair practices.

### *JURISDICTION*

2. Jurisdiction of this Court arises under 15 U.S.C §1692k and 28 U.S.C.§1337, and supplemental jurisdiction exists for the state law claim pursuant to 28 U.S.C.§ 1367.

1

## ALLEGATIONS AS TO PARTIES

3. At all times material hereto, Plaintiff, Martin Cherry ("Mr. Cherry") was *sui juris* and a resident of Broken Arrow, Tulsa County, Oklahoma.

4. At all times material hereto, Defendant, Turtle Creek Assets Ltd. ("TCA LP"), was a Texas limited partnership doing business in Tulsa County, Oklahoma.

5. At all times material hereto, Defendant, Royal Park Holdings ("RPH"), was a Texas corporation doing business as "Forward Properties" in Tulsa County, Oklahoma.

6. At all times material, RPH was the general partner of TCA LP.

7. At all times material hereto, TCA LP and RPH (collectively, "Turtle Creek"), were and are engaged in the collection of consumer debts using mail and telephone communications to debtors in the State of Oklahoma.

8. Defendants are properly subject to jurisdiction in the courts of this State pursuant to the Oklahoma long arm statute, by operating, conducting, engaging in, or carrying on a business in this state, committing a tortious act within the state, and/or causing injury to persons within the state arising from an act or omission by Defendants outside the state, when Defendants was engaged in debt collection activities within the state.

9. All acts and omissions of any agent, employee or representative of Defendants were committed with the express, implied, or apparent authority of Defendants or were subsequently ratified by Defendants.

## FACTUAL ALLEGATIONS

### A. *History of Collection Abuse and Harassment Practices of Turtle Creek*

#### *1. Introduction*

2

10. For many years, Turtle Creek has broken consumer protection laws around the country through its debt collection activities. The story is always the same. Turtle Creek uses strong arm tactics of threats of arrest to coerce consumers into paying debts.

11. Turtle Creek is a privately owned Dallas-based company that was organized and is owned and managed by Gordon Scott Engle ("Mr. Engle").

12. Over the last decade, Turtle Creek has accumulated a vast portfolio of consumer debt more than one billion dollars. The portfolio of Turtle Creek is characterized by what can best be described as "poverty debt" – that is credit obligations that low-income persons incur for items such as leasing of cellular phones and furniture.

13. According to Turtle Creek, Turtle Creek purchased over $835 million of defaulted consumer debt ("Aaron's Debt Portfolio") from Aaron's, Inc., d/b/a "Aaron's Rent to Own" ("Aaron's Rental").[1]

14. The Aaron's Debt Portfolio contains debt accounts which Turtle Creek knew were not legitimate.

15. On February 18, 2020, Turtle Creek filed an action against Aaron's Rental in that certain case styled "*Turtle Creek, Ltd. v. Aaron's, Inc.,* in the State Court, Cobb County, Georgia; Case No.: 20-1-2626" ("Debt Portfolio Litigation").

16. In the Debt Portfolio Litigation, Turtle Creek alleged *inter alia* that the Aaron's Debt Portfolio included consumer accounts that were not delinquent or that had been paid.

---

[1] Complaint [DE1] in "*Turtle Creek Assets Ltd. v. Aaron's Inc.*; In the United States District Court for the Northern District of Texas; Case No. 15-CV-03851-RWS."

17. In a press release by Turtle Creek as to the Debt Portfolio Litigation, Mr. Engle stated:

> "During the past 10 years, TCA [Turtle Creek] has bought hundreds of millions of dollars face amount of accounts from Aaron's relating to hundreds of thousands of customers of Aaron's… "[W]e bought these accounts with the express understanding that these were valid accounts with true amounts owing, and that they represented only instances in which the customer had not settled his account and the merchandise had not been returned."[2]

18  Notwithstanding the fact that Turtle Creek knew that a significant portion of the Aaron's Debt Portfolio was illegitimate or impaired, Turtle Creek nonetheless proceeded to attempt to collect monies from consumers, including Mr. Cherry, without good cause or justification.

### 2. Pattern and Practice of Misconduct

#### a. Consumer Complaints as to Collection Practices

19. Turtle Creek has acquired a reputation among consumers for abusive collection practices. Consumer complaints against Turtle Creek for these practices are scathing and too numerous to quote in full.

20. As seen below, Turtle Creek purposefully conceals its identity when it communicates with consumers so that many grievances do not identify Turtle Creek but rather Aaron's Rental.

21. Consumers consistently tell the same story: that Turtle Creek collectors attempt to collect debts by extortion.

---

[2] https://www.prnewswire.com/news-releases/turtle-creek-assets-sues-aarons-alleging-company-knew-customer-data-was-bad-301007914.html

22. The Better Business Bureau assigned an "F" rating to Turtle Creek because of the number of complaints about its lawlessness. [3]

23. Consumers have registered their objections to the business practices of Turtle Creek on the internet, including social media, blogs, and other forums:

*From Better Business Bureau (last accessed on 06-16-20)*

| Teri G | |
|---|---:|
| | 02/25/2020 |
| I got a letter from them saying if I didnt pay them that I was facing criminal charges. The date they have for said contract is not even the right date it's actually a year later the date they have so that must be when they bought the contract. | |

| Tiffany | |
|---|---:|
| | 02/14/2020 |
| FRAUD!!!!! They are trying to get you to provide information. Do not provide or confirm ANYTHING!!!! BBB needs to really work harder to protect innocent consumers from fake threats. I do not owe Aaron's and IF I DID it would be on my credit report ALREADY. I AM NOT THE ONE. If AARON's provided my information I will SUE! This is RIDICULOUS. | |

---

[3] https://www.bbb.org/us/tx/dallas/profile/collections-agencies/turtle-creek-assets-ltd-0875-90846254

*From Avvo (last accessed on 06-16-20)*

> Asked in Poughkeepsie, NY | May 24, 2018
>
> Turtle creek assets management
>
> I received a call from a debt collector saying I owed 700 dollars on a bed set I rented from Aaron's furniture store. They said I needed to pay 100 dollars today or my file would be sent to the district attorneys office and I would go to court and face 5 felonies. I want to know can this happen? The name of the people who called me are LTd assets mamnagement.

*From Facebook (last accessed on 06-16-20)*

> Beth Burnette  doesn't recommend Turtle Creek Assets.
> Yesterday at 3:04 PM ·
> Recieved a letter for a bed I no longer have, it was taken back by Aaron's 4 years ago. I tired to tell all of that to Myra only to be called a liar, and told if I learned the same english as her, I may be able to understand her! I wasn't aware you could racially speak to people like that. Then when I called her on it and wanted a supervisor, I was told no, she has been on her job 13 years she didnt need to transfer me. Then told me she will just press criminal charges and hung up! I have called multiple times today and noone will call back. I have contacted the BBB and have started the process to file a complaint. Your racism and rudeness will not be taken lightly..

  b. ***Government and Private Attorney General Enforcement Proceedings***

24. The business practices of Turtle Creek have not gone unnoticed by state and federal regulators as well as litigants acting as private attorney generals. *See, e.g, Shillingburg v. Turtle Creek Assets, Ltd,* 2019 WL 1430698 (Ohio Ct. App. 9th Dist. March 29, 2019) [underlying complaint that collectors called third parties and threatened prosecution]; *Williams v. Turtle Creek Assets, Ltd*, 2019 WL 2230126 (M.D. Fla. April 1, 2019) [over 100 calls to consumer].

25. On July 10, 2019, the Attorney General of North Carolina filed a Complaint against Turtle Creek and its principal, Mr. Engle, in that certain case styled "*State of North Carolina, ex rel. v. Turtle Creek Assets, Ltd., etc.*; in the General Court of Justice, Superior Court Division, State of North Carolina, County of Wake, Case No. CV-009338" ("North Carolina Enforcement Proceeding").

26. A copy of the Complaint in the North Carolina Enforcement Proceeding is attached hereto as Exhibit "A."

27. In the North Carolina Enforcement Proceeding, the North Carolina Attorney General asserted in almost a near-identical fashion the same grievances of consumers above (and Mr. Cherry below).

28. On July 24, 2019, the Court having jurisdiction of the North Carolina Enforcement Proceeding entered a preliminary injunction ("Preliminary Injunction") against the defendants. A copy of the Preliminary Injunction is attached hereto as Exhibit "B."

29. Pursuant to the Preliminary Injunction, Defendants were restrained from:

    (a) using threats or coercion in attempting to collect purported consumer debts by falsely accusing or threatening to accuse consumers of crimes;

    (b) using threats or coercion in attempting to collect purported consumer debts by threatening to make false reports to the credit reporting agencies;

    (c) using threats or coercion in attempting to collect purported consumer debts by representing that non-payment will result in arrest;

    (d) using threats or coercion in attempting to collect purported consumer debts by threatening to take an action not permitted by law;

(e) using harassing, abusive, profane or obscene language in attempting to collect purported consumer debts;

(f) making unreasonable publication in attempting to collect purported consumer debts;

(g) making deceptive representations in attempting to collect purported consumer debts by communicating with consumers in a name other than that of the collection agency or to whom the debt is owed;

(h) making deceptive representations by failing to disclose in initial written communications with consumers that the communication is from a debt collector attempting to collect a debt; and

(i) operating in the State of North Carolina without the required certification or registration from the North Carolina Secretary of State.

30. In February 2020, the North Carolina Department of Insurance filed criminal charges against Mr. Engle in that certain case styled "*State of North Carolina, Department of Insurance v. Gordon Scott Engle,* State of North Carolina, County of Mecklenburg ("North Carolina Criminal Proceeding").

31. In the North Carolina Criminal Proceeding, the North Carolina Department of Insurance has asserted that Mr. Engle has been operating as a debt collector in North Carolina without obtaining the required state license.

32. As a result of the pendency of the North Carolina Criminal Proceeding, the North Carolina Enforcement Proceeding was stayed, but the Preliminary Injunction remained in full force and effect.

\*             \*             \*

33. Despite the outcry of harmed consumers and lawsuits seeking redress, the unlawful practices of Turtle Creek have continued unabated.

34. As detailed below, Defendants flout consumer protection laws in Oklahoma (and the Preliminary Injunction in the North Carolina Enforcement Proceeding) as Defendants are doing exactly the same thing using the exact same forms and practices – right down to using a nearly identical collection letter form.

**B. Details of Collection Abuse and Harm Experienced by Mr. Cherry**

*1. Acquisition of Furniture*

35. Several years before the filing of this action, Mr. Cherry entered into a rent-to-own agreement ("Rent-to-Own Contract") with Aaron's Inc. doing business as "Aaron's Rentals" ("Aaron's Rentals") with respect to various items of furniture ("Furniture").

36. After entering the Rent-to-Own Contract, Aaron's Rentals delivered the Furniture to home in Muskogee, Oklahoma that he shared with his family.

37. In or about May 2015, Mr. Cherry called Aaron's Rentals to advise Aaron's Rentals that he was relocating to Tulsa and to request that Aaron's Rentals retrieve the Furniture.

38. To the best of the recollection and knowledge of Mr. Cherry, Aaron's Rentals picked up the Furniture sometime after the call by Mr. Cherry.

39. In the several years that followed, Mr. Cherry did not receive a notice or any communication from Aaron's Rentals that Mr. Cherry owed money under the Rent-to-Own Contract or that the Furniture had not been returned. Indeed, Mr. Cherry continued to acquire other furnishings from Aaron's Rentals after the Rent-to-Own Contract.

### *2. Receipt of Menacing Collection Letter*

40. At some unknown time during the last several years, Turtle Creek purchased the Rent-to-Own Contract from Aaron's Rentals under unknown terms and for unknown consideration.

41. On July 10, 2020, Turtle Creek sent or caused to be sent to Mr. Cherry a written communication known more commonly as a "dunning letter" for the purpose of collecting monies under the Rent-to-Own Contract ("Collection Letter").

42. A copy of the Collection Letter is attached hereto and incorporated by reference as Exhibit "A."

43. Through the Collection Letter, Turtle Creek falsely represented to Mr. Cherry that he would be subject to criminal prosecution if he did not make arrangements to return the Furniture:

> Pursuant to § 21-1451. Crimes and Punishments – Embezzlement defined.
>
> YOU HAVE SEVEN (7) DAYS FROM THE RECEIPT OF THIS DEMAND TO RETURN THE LEASED PROPERTY TO Aarons Rentals Store Number C0501, Store Address 30 E Shawnee Rd, City: Muskogee in Muskogee County, State of OK  OR A CRIMINAL COMPLAINT MAY BE FILED WITH THE PROPER AUTHORITIES FOR CRIMINAL PROSECUTION. Please note, no decision has been made to take legal action against you at this time. We want to help you avoid any possible legal action.

("Criminal Prosecution Threat")

44. The Criminal Prosecution Threat was false and deceptive insofar as Aaron's Rentals had no intention to prosecute Mr. Cherry. Indeed, Aaron's Rentals had no further interest in the Rent-to-Own Contract as a result of the sale of same to Turtle Creek.

45. The purpose of the Collection Letter was to have Mr. Cherry and other persons who received the Collection Letter to contact Turtle Creek as opposed to Aaron's Rentals.  Indeed, the

Collection Letter did not provide a telephone number for Aaron's Rentals but rather a telephone number to connect Mr. Cherry and other persons to persons employed by Turtle Creek.

46.     To make the false threat of criminal prosecution more effective, Turtle Creek provided a "statutory notice" that simulates the mandated disclosures of 21 Okl. St. Ann.§ 1451 A 9.

47.     The Oklahoma legislature enacted 21 Okl. St. Ann.§ 1451 to assist lessors of personal property in recovering property from lessees and not as a bludgeon to coerce payment.

48.     The purpose of the Collection Letter was to have Mr. Cherry and other persons who received the Collection Letter to contact Turtle Creek as opposed to Aaron's Rentals. Indeed, the Collection Letter did not provide a telephone number for Aaron's Rentals but rather a telephone number to connect Ms. Griffin to persons employed by Turtle Creek.

49.     The Collection Letter was purposefully drafted to deceptively conceal that Turtle Creek was the party sending the communication as opposed to Aaron's Rentals. Indeed, there was no reference to Turtle Creek anywhere on the face of the letter.

50.     To create the ruse that Aaron's Rentals was actively involved in the collection, Turtle Creek purposefully crafted the letterhead to simulate an address to a business office connected to Aaron's Rentals:

> Aarons Account Number
> C0501-18975
> 8551 East Anderson Dr Suite 106
> Scottsdale AZ
> 85255-5451

("Deceptive Letterhead")

### *2. Abusive Telephone Call with Mr. Cherry*

51. When Mr. Cherry read the Collection Letter, Mr. Cherry immediately panicked and became afraid that he would be put in jail. The fears of Mr. Cherry were especially acute as he did have possession of the Furniture and would have difficulty in documenting what happened to the Furniture because of the passage of time.

52. To address the problem without being arrested, Mr. Cherry telephoned the number provided by Turtle Creek and spoke to collectors.

53. Mr. Cherry told the collectors that he had received a letter and wanted information about the debt, especially an explanation as what happened to the Furniture that had been returned several years earlier.

54. Instead of speaking to Mr. Cherry in a respectful and professional matter, a female collector raised her voice to purposefully intimidate Mr. Cherry.

55. The collector threatened Mr. Cherry with immediate arrest:

> *"if you do not pay, we will file criminal charges."*

56. Mr. Cherry was shocked.

57. In panic, Mr. Cherry now demanded that the collector provide documentation about the claimed debt, especially as he was having a collector threaten him with jail.

58. The collector responded with a refusal to provide Mr. Cherry with any documentation.

59. Mr. Cherry could feel his pulse race and his heart pound.

60. Mr. Cherry became agitated.

61. Mr. Cherry informed the collector that he would not pay anything unless he was provided proof that he owed money for the Furniture.

62. The call ended when the collector told Mr. Cherry to "*go to hell*."

63. Defendants are guilty of intentional misconduct or gross negligence in the above-described activities. Defendants either had actual knowledge of the wrongness of its conduct and a high probability that injury or damage to Mr. Cherry would result and, despite that knowledge, intentionally pursued that course of conduct resulting in injury or damage, or alternatively, the conduct of Defendants was so reckless or wanting in care that it constituted a conscious disregard and indifference to the rights of the persons exposed to such conduct.

## COUNT I - ACTION FOR VIOLATION OF THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT (15 U.S.C. §1692 *ET SEQ.*)

64. This is action for violation of 15 U.S.C. §1692, *et seq.*, known more commonly as the "Fair Debt Collection Practices Act" ("FDCPA")

65. Mr. Cherry realleges and reaffirms the allegations contained in Paragraphs 1 through 63 above as if set forth hereat in full.

66. At all times material hereto, Mr. Cherry was a "consumer" as said term is defined under 15 U.S.C. §1692a (3).

67. At all times material hereto, Aaron's Rentals was a "creditor" as said term is defined under 15 U.S.C. §1692a (4).

68. At all times material hereto, the Rent-to-Own Contract was a "debt" as said term is defined under 15 U.S.C. §1692a (5)

69. At all times material hereto, Defendants were "debt collector(s)" as said term is defined under 15 U.S.C. §1692a (6).

70. As more particularly described above, Defendants violated the FDCPA in that Defendants have:

(a) engaged in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt in contravention of 15 U.S.C. §1692d;

(b) used obscene or profane language or language the natural consequence of which is to abuse the hearer or reader in contravention of 15 U.S.C. §1692d (2);

(c) used false, deceptive, or misleading representations in connection with the collection of any debt in contravention of 15 U.S.C. §1692e;

(d) made a false representation of the character, amount or legal status of any debt in contravention of 15 U.S.C. §1692e (2)(A);

(e) made a representation or implication that non-payment of a debt will result in the arrest or imprisonment of a person in contravention of 15 U.S.C.§1692e (4);

(f) made a threat to take any action that cannot legally be taken or is not intended to be taken in contravention of 15 U.S.C.§1692e (5);

(g) used false representations and deceptive means to collect or attempt to collect a debt in in contravention of 15 U.S.C.§1692e (10);

(h) failed to disclose in the initial communication with Mr. Cherry as a consumer that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in any subsequent communication that the communication is from a debt collector in contravention of 15 U.S.C.§1693e (11);

   (i) used any business, company or organization name other than the true name of the debt collector's business, company or organization in contravention of 15 U.S.C. §1692e(14); and

   (j) used unfair and unconscionable means to collect or attempt to collect a debt in contravention of 15 U.S.C. §1692f.

71. 15 U.S.C. §1692g provides, in pertinent part, the following:

Notice of Debts; Contents

Within five days after the initial communication from the consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer written notice containing:

(a) The amount of the debt;

(b) The name of the creditor to whom the debt is owed;

(c) A statement that unless the consumer, within thirty days after receiving the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(d) A statement that if the consumer notifies the debt collector in writing within the thirty day period, the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of the judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(e) A statement that upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

72. The Defendant violated the requirements of 15 U.S.C. §1692g:

(a) by failing to provide Mr. Cherry with a notice of validation rights as required by the FDCPA in that the Collection Letter failed to have the required disclosures under 15 U.S.C. §1692g (a)(2), (a)(4) and (a) (5); and

(b) by communicating with Mr. Cherry in a manner that overshadowed and was inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor in contravention of 15 U.S.C. §1692g (b).

73. As a direct and proximate result of the violation of the FDCPA by Defendant, Mr. Cherry has been damaged. The damages of Mr. Cherry include but are not necessarily limited to mental pain and shock, suffering, aggravation, humiliation, and embarrassment.

74. Pursuant to 15 U.S.C. 1692k, Mr. Cherry is entitled to recover actual damages together with statutory damages of $1,000.00, along with court costs and reasonable attorney's fees.

75. Mr. Cherry has retained the undersigned counsel to represent his interest herein and is obligated to pay said counsel a reasonable fee for its services.

WHEREFORE, Plaintiff, Martin Cherry, an individual, demands judgment against Defendants, Turtle Creek Assets Ltd., a Texas limited partnership, by and through its general partner, Royal Park Holdings, Inc., a Texas corporation, doing business as "Forward Properties, Inc.," for compensatory and statutory damages, together with interest, costs and attorney's fees pursuant to 15 U.S.C. §1692k, and for such other and further relief as justice may require.

## COUNT II- ACTION FOR VIOLATION OF THE
## OKLAHOMA CONSUMER PROTECTION ACT

76. This is an action for violation of 15 Okla. Stat. § 751, *et seq*. known more commonly as the "Oklahoma Consumer Protection Act." ("OCPA").

77. Mr. Cherry realleges and reaffirms the allegations contained in Paragraphs 1 through 63 above as if set forth hereat in full.

78. As more particularly described above, Defendants violated the OCPA by using obscene or profane language to collect a debt in contravention of 15 Okla. Stat. §753 (32).

79. Pursuant to 15 Okla. Stat. §753 (32), due to the unconscionable conduct of Defendants, Defendants are liable to Plaintiff for the payment of an additional civil penalty, in the amount of Two Thousand Dollars ($2,000.00) for each violation.

80. Pursuant to 23 Okla. Stat. §9.1, due to the intentional acts and malicious acts of Defendants, Defendants are each liable to Plaintiff for an award of punitive damages.

81. As a direct and proximate result of the violation of the OCPA by Defendants, Mr. Cherry has been damaged. The damages of Mr. Cherry include but are not necessarily limited to mental pain and shock, suffering, aggravation, humiliation, and embarrassment.

82. Mr. Cherry has retained the undersigned law firm to represent his interest herein and is obligated to pay said law office a reasonable fee for its services.

83. Pursuant to 15 Okla. Stat. §761.1 A., Mr. Cherry is entitled to recover actual damages, together with reasonable attorney's fees and court costs.

WHEREFORE, Plaintiff, Martin Cherry, an individual, demands judgment against Defendants, Turtle Creek Assets Ltd., a Texas limited partnership, by and through its general

partner, Royal Park Holdings, Inc., a Texas corporation, doing business as "Forward Properties, Inc.," for compensatory, statutory and punitive damages, together with interest, costs and attorney's fees pursuant to 15 Okla. Stat. §761.1.

## COUNT III- ACTION FOR VIOLATION OF THE
## OKLAHOMA RENTAL-PURCHASE ACT

84. This is an action for violation of 59 Okla. Stat. § 1950, *et seq*. known more commonly as the "Oklahoma Rental-Purchase Act" ("ORPA").

85. Mr. Cherry realleges and reaffirms the allegations contained in Paragraphs 1 through 63 above as if set forth hereat in full.

86. At all times material hereto, the Rent-to-Own Contract was a "rental-purchase agreement" as said term is defined under 59 Okla. Stat. § 19519.

87. At all times material hereto, Mr. Cherry was a "lessee" as said term is defined under 59 Okla. Stat. § 19517.

88. At all times material hereto, Aaron's Rent to Own was a "lessor" as said term is defined under 59 Okla. Stat. § 19518.

89. Pursuant to 59 Okla. Stat. § 1952A, no person shall engage in business as a rental-purchase lessor without first obtaining a license issued by the State of Oklahoma.

90. Pursuant to 59 Okla. Stat. § 1957, the Oklahoma Legislature directed that the ORPA applies to persons, who directly collect payments from or enforce rights against debtors arising from the rental-purchase agreement.

91. At all times material hereto, Defendants lacked the mandated licensure under the ORPA.

92. Pursuant to 59 Okla. Stat. § 1955, Mr. Cherry is entitled to recover from Defendants actual damages together with twenty-five percent (25%) of the amount equal to the total payments required to obtain ownership of the Furniture in an amount not less than One Hundred Dollars ($100.00) nor more than One Thousand Dollars ($1,000.00), together with reasonable attorney's fees and costs.

WHEREFORE, Plaintiff, Martin Cherry, an individual, demands judgment against Defendants, Turtle Creek Assets Ltd., a Texas limited partnership, by and through its general partner, Royal Park Holdings, Inc., a Texas corporation, doing business as "Forward Properties, Inc.," for actual and statutory damages, together with interest, costs and attorney's fees pursuant to 59 Okla. Stat. § 1955.

## DEMAND FOR JURY TRIAL

Plaintiff, Martin Cherry, pursuant to Rule 38, Federal Rules of Civil Procedure, demands a trial by jury of all issues so triable.

*/s/ Robert W. Murphy*
ROBERT W. MURPHY, ESQUIRE
Florida Bar No. 717223
1212 S.E. 2nd Avenue
Fort Lauderdale, Florida 33316
Telephone: (954) 763-8660
Fax: (954) 763-8607
rwmurphy@lawfirmmurphy.com

VICTOR R. WANDRES, ESQUIRE
Oklahoma Bar No. 19591
Paramount Law
1202 E. 33rd Street
Tulsa, Oklahoma 74105
Telephone: (918) 200-9272
Fax: (918) 895-9774
victor@paramount-law.com